UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ALBERT CORKERN** | **CIVIL ACTION** |
| **VERSUS** | **NO.  07-9276** |
| **BURL CAIN, WARDEN** | **SECTION "S"(4)** |

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  *See* 28 U.S.C. § 2254(e)(2) (2006).[1]

**I.      Factual and Procedural Background**

The petitioner, Albert Corkern ("Corkern"), is a convicted inmate incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2]  On May 17, 2001, Corkern was indicted by a Grand Jury in Tangipahoa Parish for the second degree murder of his wife, Elaine Corkern.[3]

---

[1]Under 28 U.S.C. § 2254(e)(2), an Evidentiary Hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2]Rec. Doc. 4.

[3]St. Rec. Vol. 1 of 2, Indictment, 5/17/01.

###### A.    __Factual Background__

The record reflects that, on March 30, 2001, Corkern and his wife, Elaine, were alone in their residence in Tickfaw, Louisiana.[4]   At some point during the night, the couple engaged in an argument during which Elaine threatened to leave Albert.   In response, Albert fired a single shot from a .22 caliber rifle to her head, which fatally injured his 39 year old wife.

On April 1, 2001, Corkern was arrested for the murder of his wife.[5]   Corkern made a statement to the police in which he confessed to the shooting.[6]   His counsel, on August 21, 2001, filed a motion to suppress the statement and other evidence, which was denied after a hearing on January 30, 2002.[7]

Corkern was tried before a jury on March 11, through March 14, 2003, and was found guilty as charged of second degree murder.[8]   Corkern's counsel, on April 15, 2003, thereafter filed motions in arrest of judgment, for new trial, and for post-verdict judgment of acquittal.[9]   The Trial Court denied each of these motions, and after waiver of legal delays, sentenced Corkern that same day to

---

[4]The facts are taken from the published opinion of the Louisiana First Circuit Court of Appeal on direct appeal. *State v. Corkern*, 897 So.2d 57, 59 (La. App. 1st Cir. 2004); St. Rec. Vol. 2 of 2, 1st Cir. Opinion, 2003-KA-1393, p. 2, 9/17/04.

[5]St. Rec. Vol. 1 of 2, Arrest Report, 4/01/01.

[6]St. Rec. Vol. 1 of 2, Corkern's Statement, 4/01/01.

[7]St. Rec. Vol. 1 of 2, Motion to Suppress Statement and Evidence, 8/21/01; Hearing Transcript, 1/30/02.

[8]St. Rec. Vol. 1 of 2, Trial Minutes, 3/11/03; Trial Minutes, 3/12/03; Trial Minutes, 3/13/03; Trial Minutes, 3/14/03; Jury Verdict, 03/14/03; Trial Transcript, 3/11/03; Trial Transcript, 3/12/03; Trial Transcript, 3/13/03; Trial Transcript, 3/14/03.

[9]St. Rec. Vol. 1 of 2, Motion in Arrest of Judgment, 4/15/03; Motion for New Trial, 4/15/03; Motion for Post-Verdict Judgment of Acquittal, 4/15/03.

serve life in prison at hard labor without the benefit of parole, probation, or suspension of sentence.[10] The Court also denied counsel's motion to reconsider that sentence.[11]

On direct appeal to the Louisiana First Circuit Court of Appeal, Corkern's appointed counsel raised two assignments of error: (1) the evidence was insufficient to support the verdict; and (2) the Trial Court erred in denying the motion to suppress the inculpatory statement.[12]  On September 17, 2004, the Louisiana First Circuit affirmed the conviction finding no merit to either claim.[13]

On October 8, 2004, Corkern submitted a writ application to the Louisiana Supreme Court.[14] The Court denied the application without stated reasons on February 18, 2005.[15]  Corkern's conviction became final 90 days later, on May 19, 2005, because he did not file a writ application with the United States Supreme Court.  *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)); U.S. S. Ct. Rule 13(1).

---

[10]St. Rec. Vol. 1 of 2, Sentencing Minutes, 4/15/03; Sentencing Transcript, p. 11, 4/15/03.

[11]*Id*.; St. Rec. Vol. 1 of 2, Motion to Reconsider Sentence, 4/15/03.

[12]St. Rec. Vol. 2 of 2, Appeal Brief, 2003-KA-1393, undated copy; *State v. Corkern*, 897 So.2d at 59, 63; St. Rec. Vol. 2 of 2, 1st Cir. Opinion, 2003-KA-1393, pp. 2, 8, 9/17/04.

[13]*State v. Corkern*, 897 So.2d 57, 59 (La. App. 1st Cir. 2004); St. Rec. Vol. 2 of 2, 1st Cir. Opinion, 2003-KA-1393, p. 2, 9/17/04. Id., 2003-KA-1393, 09/17/04.

[14]St. Rec. Vol. 2 of 2, La. S. Ct. Writ Application, 2004-KO-2627, signature dated 10/08/04.  The record copy does not bear a file stamp.

[15]*State v. Corkern*, 896 So.2d 29 (La. 2005); La. S. Ct. Order, 2004-KO-2627, 2/18/05.

### B.    **Procedural Background**

On August 5, 2005, Corkern submitted a motion seeking copies of certain transcripts and documents from the Trial Court.[16]  The same day, the Trial Court denied the motion without stated reasons.[17]  His subsequent writ application to the Louisiana First Circuit was also denied for failure to include the documentation required for the Court's review.[18]

On October 28, 2005, Corkern submitted an application for post-conviction relief to the Trial Court raising five grounds for relief:[19] (1) a biased female juror was allowed to serve on the jury; (2) the Trial Court failed to properly respond when it was notified that a prospective female juror, Carolyn Garner, was biased and tainted the other jurors who actually served; (3) ineffective assistance of trial counsel where trial counsel refused to allow Corkern to testify; (4) ineffective assistance of counsel where counsel (a) failed to investigate, call defense witnesses, or put on any defense, (b) failed to object to bias jurors, (c) stipulated to the testimony of the State's forensic expert, (d) failed to ask for a sanity commission or request funds for defense experts, and (e) failed to raise intoxication as a defense; and (5) ineffective assistance of appellate counsel where appellate counsel failed to investigate the violation of his rights before filing the appeal.  According to the record, the Trial Court denied the application as untimely on January 25, 2006.[20]

---

[16]St. Rec. Vol. 2 of 2, Motion for Production of Documents, 8/05/05.

[17]St. Rec. Vol. 2 of 2, Trial Court Order, 8/05/05.

[18]St. Rec. Vol. 2 of 2, 1st Circuit Order, 2005-KW-1943, 11/15/05.

[19]St. Rec. Vol. 2 of 2, Application for Post-Conviction Relief, 11/22/05 (signed 10/28/05).

[20]Neither the record nor the exhibits submitted by the petitioner contain a copy of this ruling.  The ruling is, however, referenced in the Louisiana First Circuit's subsequent order referred to below.

On May 15, 2006, the Louisiana First Circuit granted Corkern's writ application and vacated the Trial Court's order based on untimeliness finding that Corkern's petition was timely filed within the two (2) years from finality allowed under La. Code Crim. P. art. 930.8.[21]

While the matter was pending before the Trial Court on remand, Corkern filed another motion for copies of documents on May 24, 2006.[22]  The Trial Court granted the request on June 1, 2006.[23]  Thereafter, Corkern submitted a supplemental application for post-conviction relief on June 22, 2006.[24]  In this application, Corkern added one additional claim to the five already raised and alleged that the Trial Court erroneously allowed the testimony of prior bad acts to be admitted at trial.  On August 22, 2006, the Trial Court held a hearing and thereafter denied the application without specified reasons.[25]

Corkern sought review of the Trial Court's order in the Louisiana First Circuit on September 18, 2006.[26]  The Court denied relief on November 29, 2006, without stated reasons.[27]  Thereafter, on September 28, 2007, the Louisiana Supreme Court denied Corkern's writ application without stated reasons.[28]

---

[21]St. Rec. Vol. 2 of 2, 1st Cir. Order, 2006-KW-0238, 5/15/06.

[22]St. Rec. Vol. 2 of 2, Motion for Production of Documents, 5/24/06.

[23]St. Rec. Vol. 2 of 2, Trial Court Order, 6/01/06.

[24]St. Rec. Vol. 2 of 2, Uniform Application for Post-Conviction Relief, 6/22/06 (dated 6/20/06).

[25]St. Rec. Vol. 2 of 2, Post-Conviction Hearing Transcript, p. 13, 8/22/06; Trial Court Order, 8/22/06.

[26]St. Rec. Vol. 2 of 2, Copy of 1st Cir. Writ Application, signature dated 9/18/06.  The copy in the record provided is not file stamped by the clerk of the Louisiana First Circuit.

[27]St. Rec. Vol. 2 of 2, 1st Cir. Order, 2006-KW-1893, 11/29/06.  One judge dissented indicating that he would first require the Trial Court to supplement the writ record with certain portions of the trial transcript.

[28]*State ex rel. Corkern v. State*, 964 So.2d 354 (La. 2007); St. Rec. Vol. 2 of 2, La. S. Ct. Order, 2006-KH-3001, 9/28/07.

## II.   **Federal Petition**

On January 9, 2008, the Clerk of this Court filed Corkern's petition for federal habeas corpus relief in which he raised seven grounds for relief:[29]

(1) the evidence was insufficient to support the conviction;

(2) the Trial Court erred in denying the motion to suppress Corkern's inculpatory statement;

(3) he was prejudiced when the Trial Court denied the cause challenge to Carolyn Garner, because she was biased in favor of law enforcement;

(4) the Trial Court erred in failing to respond after being notified that a prospective female juror was biased and tainted other members who actually served on the jury;

(5) the Trial Court erred in allowing other crimes evidence to be admitted at trial;

(6) ineffective assistance of counsel where counsel refused to allow petitioner to testify;

(7) ineffective assistance of counsel where trial counsel (a) failed to investigate, call witnesses, or present any defense, (b) failed to object to admission of prior bad acts, (c) stipulated to the testimony of the State's forensic expert, (d) failed to ask for a sanity commission or request funds for defense experts, and (e) failed to raise intoxication as a defense; and

(8) ineffective assistance of appellate counsel where appellate counsel failed to investigate the violation of his rights before filing the appeal.

The State filed an answer and memorandum in opposition to Corkern's petition arguing that the claims raised are without merit and the petition should be denied or dismissed with prejudice.[30] Corkern filed a traverse to the State's arguments in which he reiterates the arguments in support of his claims.[31]

---

[29]Rec. Doc. No. 4-1, Memorandum in Support.

[30]Rec. Doc. Nos. 9, 10.

[31]Rec. Doc. No. 11.

### III.    General Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-

132, 110 Stat. 1214,[32] applies to this petition, which is deemed filed in this court under the federal

mailbox rule on November 9, 2007.[33]  The threshold questions in habeas review under the amended

statute are whether the petition is timely and whether the claim raised by the petitioner was

adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies

and must not be in "procedural default" on a claim.  *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th

Cir. 1997) (citing 28 U.S.C. § 2254(b), (c) (2006)).

The State has not presented any procedural defenses to Corkern's petition.  In reviewing the

procedural history of this matter, the Court finds that the petition is timely filed.  Each claim raised

in the petition has been adjudicated on the merits in each of the state courts for exhaustion purposes.

### IV.    Merits Review Standard

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's decision

in *Williams v. Taylor*, 529 U.S. 362 (2000).  It provides different standards for questions of fact,

questions of law, and mixed questions of fact and law.

---

[32]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996.  *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).  The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[33]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  The Clerk of Court filed Corkern's federal habeas petition on January 9, 2008, when the filing fee was paid.  Corkern dated his signature on the petition and memorandum on November 9, 2007.  This is presumed to be the earliest date on which he could have delivered it to prison officials for mailing.  The fact that he paid the filing fee on a later date does not alter the application of the federal mailbox rule to his pro se petition.  *See Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002) (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing *Spotville*, 149 F.3d at 374).

A state court's determinations of questions of fact are presumed correct and the court must give deference to the state court findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2) (2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1) (2006).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA. The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable application of clearly established federal law" as determined by the United States Supreme Court. *Hill*, 210 F.3d at 485.

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*, 210 F.3d at 485. A state court's decision can involve an "unreasonable application" of federal law if it either: (1) correctly identifies the governing rule but then applies it unreasonably to the facts; or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law. *cf. Wright v. West*, 505 U.S. 277, 304

(1992).  The court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law.  *See, e.g., id.* at 305; *see also Chambers v. Johnson*, 218 F.3d 360, 364 (5th Cir. 2000), *cert. denied*, 531 U.S. 1002 (2000).  "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'" *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)) (brackets in original); *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

Thus, under the "unreasonable application" determination, the Court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002).  The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner.  *Price*, 538 U.S. at 641 (quoting  *Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006).

## V.    Analysis

### A.    Sufficiency of the Evidence (Claim No. 1)

Corkern contends that  the evidence was insufficient to convict him of second degree murder which required a showing that he had the specific intent to kill or inflict great bodily harm to his wife rather than the killing being done as a result of a sudden passion.  In the alternative, the defendant argues that his actions were a result of provocation and, thus, support only a conviction of manslaughter.  He therefore contends that his second degree murder conviction violates the constitutions of the United States and Louisiana.[34]

---

[34]Rec. Doc. No. 4-1, p. 18.

The State argues that Corkern's claim lacks merit and should be denied or dismissed.  The State also notes that while it may have been true that Corkern and his wife had been arguing, the facts established at trial supported the second degree murder conviction rather than a manslaughter conviction.[35]  The State argues that, at the time of the shooting, Elaine Corkern was walking through the house gathering her belongings to leave when Corkern retrieved his rifle from behind his chair and shot her to death.

Corkern's counsel first raised this claim on direct appeal to the Louisiana First Circuit. Relying on the well-established standard in *Jackson v. Virginia*, 443 U.S. 307 (1979), and related state law, the Court reviewed the evidence and testimony presented to the jury at trial.  The Court resolved that, under Louisiana law, deliberately pointing and firing a weapon at a person at close range establishes the specific intent to kill.  The Court further resolved that the jury's verdict demonstrated that the jury did not accept the defendant's contention that his wife's threat to leave was sufficient provocation to warrant a manslaughter verdict.  The Court also found that the evidence supported their conclusion.  The Louisiana Supreme Court denied relief without stated reasons, leaving this the last reasoned decision on the issue.  *Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991) (when the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion).

The appropriate standard for determining the sufficiency of evidence is that set forth in *Jackson v. Virginia*, which was relied upon by the state appellate court on direct review.  The *Jackson* standard requires the Court to determine whether, after viewing the entire record and the

---

[35]Rec. Doc. 10.

evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Gilley v. Collins*, 968 F.2d 465, 467 (5th Cir. 1992); *Guzman v. Lensing*, 934 F.2d 80, 82 (5th Cir. 1991).

Claims of insufficient evidence present a mixed question of law and fact. *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir. 1995). The Court must therefore give deference to the state court's findings unless the decision was contrary to, or involved an unreasonable application of *Jackson*. *Gilley*, 968 F.2d at 467 (citing *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir. 1990)).

The offense of second degree murder, relevant to this case, is defined by Louisiana law as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm." La. Rev. Stat. Ann. § 14:30.1. The phrase "specific intent" is defined as the state of mind in which the perpetrator "actively desired the prescribed criminal consequences to follow his act or failure to act." La. Rev. Stat. Ann. § 14:10(1).

Under Louisiana law, intent need not be proven directly, but may be inferred from the actions of the defendant and the circumstances surrounding those actions. *State v. Sharlhorne*, 554 So.2d 1317, 1321 (La. App. 1st Cir. 1989); *State v. Tate*, 851 So.2d 921, 930 (La. 2003) (citing *State v. Brooks*, 505 So.2d 714, 717 (La. 1987)). Specific intent to kill or inflict great bodily harm can be inferred from a shooting that occurs at a fairly close range. *See* La. Rev. Stat. Ann. § 14:30.1(A)(1); *State v. Cummings,* 771 So. 2d 874, 876 (La. App. 1st Cir. 2000). To establish specific intent, the State must show that the defendant either pulled the trigger, that he acted in concert with his co-perpetrator, or that he actively acquiesced in the use of deadly force. *State v. Tate*, 851 So.2d at 930. Moreover, under Louisiana law, deliberately pointing and firing a deadly weapon at close range are circumstances that will support a finding of a specific intent to kill. *State v. Broaden*, 780

11

So.2d 349, 362 (La. 2001), *cert. denied,* 534 U.S. 884 (2001); *State v. Tassin,* 536 So.2d 402, 411 (La. 1988), *cert. denied,* 493 U.S. 874 (1989); *see also State v. Dubroc,* 755 So.2d 297, 303-304 (La. App. 3rd Cir. 1999).

The record reflects that the jury heard the testimony of Jennifer Corkern, the Corkerns' daughter-in-law.[36] She testified that she lived next door with her husband William Corkern, Albert and Elaine's son.[37] Jennifer testified that she and her husband were returning home when they overheard Albert and Elaine arguing inside their residence.[38]

The next morning when Jennifer went next door to visit with Elaine, no one answered the door.[39] She called Elaine's cell phone, and there was no answer.[40] Jennifer testified that she continued to periodically knock on the door and there was no answer. She thought it strange because Elaine's car was in the driveway.[41] Finally, around noon, when she returned and knocked on the door, Albert Corkern answered the door. He partially opened the door and told Jennifer that his wife was not feeling well.[42]

Jennifer testified that she returned later to check on her mother-in-law.[43] This time, Albert told her that she was had gone to see her friend, Ruth McGary. Jennifer testified that, at one point,

---

[36]St. Rec. Vol. 1 of 2, Trial Transcript, Jennifer Corkern Testimony, pp. 109-111, 3/12/03.

[37]St. Rec. Vol. 1 of 2, Trial Transcript, Jennifer Corkern Testimony, p. 109, 3/12/03.

[38]St. Rec. Vol. 1 of 2, Trial Transcript, Jennifer Corkern Testimony, p. 110, 3/12/03.

[39]St. Rec. Vol. 1 of 2, Trial Transcript, Jennifer Corkern Testimony, p. 115, 3/12/03.

[40]*Id.*

[41]St. Rec. Vol. 1 of 2, Trial Transcript, Jennifer Corkern Testimony, p. 116, 3/12/03.

[42]*Id.*

[43]St. Rec. Vol. 1 of 2, Trial Transcript, Jennifer Corkern Testimony, p. 126, 3/12/03.

her husband asked his father to help him unload some appliances.  She noticed that when he exited the house to help, he locked the door behind him, which she found strange.[44]

In an effort to make sure that everything was well with her mother-in-law, she later knocked on the door hoping that Elaine would answer, but she did not.[45]  When Albert returned home, she and her husband were determined to enter the residence.  They asked Albert for permission to use his phone when she observed broken beer bottles and dried blood on the floor.[46]  She testified that she noticed the couple's bedroom door closed, and she tried to open it but could not.[47]

Jennifer testified that she then called Ruth McGary, her mother-in-law's friend, to inquire about Elaine's whereabouts, and she was advised that she had not seen her at all that day.[48]  Jennifer and William then asked Albert if he had reported Elaine's disappearance, and he said that he had.[49]  Shortly thereafter, Jennifer contacted the Tangipahoa Parish Sheriff's Office and confirmed that there was a missing person report.[50]

Lieutenant David Vitter of the Tangipahoa Parish Sheriff's Office testified that he arrived at the Corkern's residence and found Elaine Corkern's body lying on the floor in their bedroom near

---

[44]St. Rec. Vol. 1 of 2, Trial Transcript, Jennifer Corkern Testimony, pp. 126-27, 3/12/03.

[45]St. Rec. Vol. 1 of 2, Trial Transcript, Jennifer Corkern Testimony, p. 130, 3/12/03.

[46]*Id.*

[47]St. Rec. Vol. 1 of 2, Trial Testimony, Jennifer Corkern Testimony, p. 132, 3/12/03.

[48]St. Rec. Vol. 1 of 2, Trial Testimony, Jennifer Corkern Testimony, p. 134, 3/12/03.

[49]St. Rec. Vol. 1 of 2, Trial Testimony, Jennifer Corkern Testimony, p. 136, 3/12/03.

[50]St. Rec. Vol. 1 of 2, Trial Testimony, Jennifer Corkern Testimony, p. 137, 3/12/03.

the foot of the bed.[51]  He testified that the body was stiff and turning blue.[52]  Lieutenant Vitter

testified that he found Albert asleep on the bed with the gun next to his head.[53]  He testified that he

secured the weapon, awakened Albert Corkern, advised him of his Miranda rights, and took him into

custody.[54]

According to Lieutenant Vitter, Albert Corkern admitted that he and his wife had been

arguing and she threatened to leave him.[55]  Corkern also admitted that he shot his wife, and he stated

that he wished he could take it back.  Lieutenant Vitter testified further that Corkern did not appear

intoxicated, that he understood his rights, and that he did not at any time request an attorney.[56]

Steven Raacke, the homicide investigator for the Tangipahoa Parish Coroner's Office,

testified that when he examined the body at the scene, it revealed a gunshot wound to the chin which

was consistent with an entrance wound and another wound behind the right ear, consistent with an

exit wound.[57]  He opined that the appearance of the powder residue around the entrance would

suggest that "the gunshot was a very close range" and "was probably a contact wound."[58]

---

[51]St. Rec. Vol. 1 of 2, Trial Testimony, Lieutenant Vitter Testimony, pp. 177, 179, 3/12/03.

[52]St. Rec. Vol. 1 of 2, Trial Testimony, Lieutenant Vitter Testimony, p. 179, 3/12/03.

[53]St. Rec. Vol. 1 of 2, Trial Testimony, Lieutenant Vitter Testimony, p. 177, 3/12/03.

[54]St. Rec. Vol. 1 of 2, Trial Testimony, Lieutenant Vitter Testimony, pp. 177, 180-81, 3/12/03.

[55]St. Rec. Vol. 1 of 2, Trial Transcript, Lieutenant Vitter Testimony, p. 184, 3/12/03.

[56]St. Rec. Vol. 1 of 2, Trial Transcript, Lieutenant Vitter Testimony, p. 183, 3/12/03.

[57]St. Rec. Vol. 1 of 2, Trial Transcript, Steven Raacke Testimony, p. 268, 3/13/02.

[58]St. Rec. Vol. 1 of 2, Trial Transcript, Steven Raacke Testimony, p. 270, 3/13/02.

During the testimony of Detective Rodney Varnado, the jury also heard the taped statement made by Corkern to the police.[59]  They were given a transcribed copy to follow.[60]  In that statement, Corkern admitted to shooting his wife when she threatened to leave him.[61]  Corkern told the officers that the matter actually began the week before his wife's death, when she left home for two (2) days. He also stated that he did not know where she was during that time, and when she returned, they argued for a while; later, he said, it was "like she never left."[62]

Corkern indicated that he and his wife began arguing again on Friday, March 30, 2001, around 10:30 p.m.  Corkern testified that during the argument, his wife again threatened to leave him and he "couldn't take it no more" so he shot her.[63]  He testified that he shot her only once with his .22 caliber rifle which he had in the living room.  He said she was going back and forth from the front door towards the bedroom when he shot from about three (3) feet away.[64]  He testified that after he shot her, he sat down and stared at the body "wishing things could be different."[65]  He further testified that he planned to shoot himself, but he could not do it.[66]  On Saturday morning, he moved the body into their bedroom.[67]  He testified that he used a towel to clean up some of the

---

[59]St. Rec. Vol. 1 of 2, Detective Varnado Testimony, pp. 219-20, 3/12/03.

[60]*Id.*

[61]St. Rec.  Vol. 1 of 2, Corkern's Statement, pp. 1-12, 4/1/01.

[62]*Id.*, p. 3.

[63]*Id.*, pp. 3-4.

[64]*Id.*, pp. 3-4, 12.

[65]*Id.*, p. 7.

[66]*Id.*, pp. 6, 10.

[67]*Id.*, pp. 9-10.

blood that had formed beneath her head.[68]  He also told the officers that when his son and daughter-in-law entered the house to look for her, he told them she had gone out with a former co-worker.[69]

The jury therefore had before it facts which would indicate that Corkern sat in his chair pondering his wife's actions as she prepared to leave their residence.  He stated that he watched her go back and forth through the living room before he decided to pick up his rifle and shoot her, at a distance of less than three (3) feet.  He then sat staring at her until the next morning when he moved her body into the bedroom.  He also tried to clean up some of the blood.  He admittedly lied to his children about her whereabouts as she lay dead in the bedroom.

In considering the sufficiency of the evidence, and viewing the evidence in the light most favorable to the prosecution, the Court finds that the evidence was sufficient to sustain a verdict of second degree murder.  To the extent Corkern suggests that the jury should have found manslaughter and not a specific intent to kill, he had the burden at trial to prove that "sudden passion" and "heat of blood" were present by a preponderance of the evidence.  *See State v. Riley*, 637 So. 2d 758, 763 (La. App. 1st Cir. 1994).  The jury, however, rendered a unanimous guilty verdict of second degree murder.[70]  As noted by the state appellate court, based on the verdict, the jury must have rejected the suggestion of manslaughter and concluded that the verbal altercation and/or the alleged threat by the victim to leave did not equate to provocation sufficient to deprive an average person of self-control and cool reflection, and that the mitigating factors, that would have reduced the degree of homicide from murder to manslaughter, were not represent in this case.[71]  The record before this Court does

---

[68]*Id.*, p. 11.

[69]*Id.*, p. 11.

[70]*State v. Corkern*, 897 So. 2d at 63; St. Rec. Vol. 2 of 2, 1st Cir. Opinion, 2003-KA-1393, p. 7, 9/17/04.

[71]*Id.*

not demonstrate that Corkern acted in the heat of passion.  To the contrary, the evidence supports the jury's finding that he reflected on his decision to pick up his rifle and shoot his gun when he decided that he did not want her to leave again and have to wonder where she was going.

For these reasons, the Court finds that the state courts' denial of relief on this claim is not contrary to, or an unreasonable application of, *Jackson*.  Corkern is not entitled to relief on this claim.

### B.      Denial of the Motion to Suppress (Claim No. 2)

Corkern argues that the Trial Court erred in denying the motion to suppress the oral inculpatory statement.  Corkern contends that the statement was not voluntarily made under the totality of the circumstances because he was intoxicated.

The State contends that this claim also lacks merit, because the testimony presented at trial indicated that Corkern did not appear to be intoxicated at the time of the statement or that he did not understand that he was waiving his right to remain silent.

This issue was considered on appeal by the Louisiana First Circuit.  The court determined that the testimony from Detective Varnado at the suppression hearing established that Corkern was read his *Miranda* rights prior to the taking of the recorded statement.  Corkern signed an Advice of Rights form signifying that he understood his rights as related to him by Detective Varnado.  The Court also resolved that, although Corkern was asleep when the officers found him, the officers testified that once he was awakened, Corkern did not exhibit any signs of intoxication.[72]  The Court

---

[72]*Id*. at. 64.

further noted that Corkern did not testify at the motion to suppress hearing.  The Court held that Corkern's constitutional rights were not violated in the taking of his statement.[73]

The Court further considered the pertinent evidence presented at trial from the officers who testified that Corkern was not intoxicated at the time of his arrest.[74]  Detective Varnado also testified that he advised Corkern of his *Miranda* rights and that Corkern indicated that he understood his rights, spoke coherently, and did not show signs of impairment.  The Court determined that this was sufficient to allow the statement to be used at trial.  This was the last reasoned opinion on the issue. *Ylst*, 501 U.S. at 797.

The admissibility of a confession or incriminating statement is a mixed question of law and fact. *Miller v. Fenton*, 474 U.S. 104, 112 (1985).  Thus, the Court must consider whether the state courts' denial of relief was contrary to, or an unreasonable application of, Supreme Court law.

The determination of the voluntariness of a confession or incriminating statement requires the Court to consider the "totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973).  A federal court entertaining a collateral challenge to the voluntariness of a confession is obliged to afford a presumption of correctness to state court findings of fact if fairly supported in the record.  *Miller*, 474 U.S. at 117.  The Court, nevertheless, is authorized to exercise de novo review over the ultimate conclusion of whether, under the totality of the circumstances, the confession was "voluntary."  *Carter v. Johnson*, 131 F.3d 452, 461-62 (5th Cir. 1997).  Although mental state or condition may be a significant factor in the voluntariness determination, "this fact

---

[73]*Id.*

[74]*State v. Corkern,* 897 So. 2d 64, (La. App. 1st Cir., 09/17/04).

does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Carter*, 131 F.3d at 462 (citing *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)).

There are two inquiries to determine whether an accused has voluntarily and knowingly waived his Fifth Amendment privilege against self-incrimination. *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Soffar v. Cockrell*, 300 F.3d 588, 592 (5th Cir. 2002). First, the waiver of the right must be voluntary in that it was not the product of intimidation, coercion, or deception. *Moran*, 475 U.S. at 421. Coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession. *Carter*, 131 F.3d at 462 (citing *Connelly*, 479 U.S. at 163-67). Second, the relinquishment must be made with a full awareness of the nature of the right being waived. *Id*. A written waiver "is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

Thus, under federal law, whether a state defendant understood his *Miranda* rights is a factual determination for the state trial court which is subject to the presumption of correctness under 28 U.S.C. 2254(e)(1) on federal habeas review. *See Carter*, 131 F.3d at 452; *Mincey v. Head*, 206 F.3d 1106, 1131 (11th Cir. 2000). Furthermore, a determination of whether officers engaged in coercive tactics to elicit a confession is a question of fact, and the state court's factual findings are also entitled to deference when supported by the record. *Pemberton v. Collins*, 991 F.2d 1218, 1225 (5th Cir. 1993); *Self v. Collins*, 973 F.2d 1198, 1204 (5th Cir. 1992); *see also Miller*, 474 U.S. at 112 (noting that subsidiary questions such as whether the police engaged in coercive tactics are afforded the presumption of correctness). Further, the habeas corpus statute obliges federal judges to respect

credibility determinations made by the trier of fact on these issues.  *Pemberton*, 991 F.2d at 1225

(citing *Sumner v. Mata*, 455 U.S. 591, 597 (1982)).[75]

In Corkern's case, the Trial Court conducted a full evidentiary hearing on the admissibility

of his inculpatory statements, as required by *Jackson v. Denno*, 378 U.S. 368 (1964).[76]  After taking

testimony of the investigating officers and reviewing the related documents, the trial court denied

the motion to suppress the statements.[77]  On direct appeal, the Louisiana First Circuit entered its own

findings on the issue.

In reviewing the claims, the Louisiana First Circuit determined that both the hearing and trial

records proved that Corkern was advised of and understood his *Miranda* warnings prior to making

his statements.[78]  The record established that he waived his rights and that both statements were

freely and voluntarily given, and that he was not under the influence of fear, duress, intimidation,

menaces, threats, inducements, or promises.  The Court further found that, under the circumstances,

there was no reason for the officers to believe that he was intoxicated or unable to understand the

rights or the waiver.

---

[75]The Court also notes that, even if a confession is deemed involuntary under these standards, the Supreme Court has held that the admission of an involuntary confession is a trial error subject to harmless error analysis.  *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991).  Under this analysis, in order to grant federal habeas relief, the trial error must have a substantial and injurious effect or influence in determining the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  Therefore, even if this court were to find that Corkern's Fifth Amendment rights were violated, the court would have to also consider whether use of the confession at trial was harmless in determining the verdict.  *Hopkins v. Cockrell*, 325 F.3d 579, 583 (5th Cir. 2003).  Based on this Court's review of the record, Corkern understood his rights and that his inculpatory statements were voluntarily given; therefore the harmless error analysis is not necessary.

[76]St. Rec. Vol. 2 of 6, Motion Hearing Minutes, 4/1/03; Motion Hearing Minutes, 4/2/03; St. Rec. Vol. 5 of 6, Hearing Transcript, 4/1/03; Hearing Transcript, 4/2/03; St. Rec. Vol. 2 of 6, Motion Hearing Minutes, 2/2/04; St. Rec. Vol. 5 of 6, Hearing Transcript, 2/2/04.

[77]St. Rec. Vol. 3 of 5, Trial Transcript (continued), p. 212, 8/8/05.

[78]*State v. Stewart*, 902 So.2d at 445; St. Rec. Vol. 2 of 6, 04-KA-1231, 4/26/05.

On federal habeas review, this Court must presume correct the factual determinations made by the state courts, including that Corkern understood his *Miranda* rights, knew the nature of the potential charges against him, and that the circumstances of his interview did not amount to duress. The same presumption applies to the state courts' factual findings concerning the voluntariness of the statement, including, among other things, that Corkern was timely advised of his *Miranda* rights, that he indicated that he understood his rights, and that he voluntarily waived those rights. *See Pemberton*, 991 F.2d at 1225.

The record before this Court supports the state courts' findings. Detective Varnado testified at the suppression hearing that the statement was taken in a small interview room and at the time, only he, Corkern, and Captain Jones were present.[79] Varnado testified that Corkern gave his statement voluntarily and that neither he nor Captain Jones coerced him into giving a statement.[80] Corkern has not alleged that either officer coerced him into making that statement. Varnado also testified that Corkern did not appear intoxicated nor did he smell alcohol on his breath. Varnado's testimony at trial was the same.

Also during the trial, Lieutenant Vitter testified that he awakened Corkern and Corkern did not do a whole lot.[81] Corkern was cuffed without resistance and walked out to the police car. Corkern was advised of his rights and secured in the car. Vitter also testified that he transported Corkern to the jail and that Corkern did not appear intoxicated.[82] He also testified that he did not recall smelling any alcohol. Corkern also indicated to Vitter that he understood his rights, he refused

---

[79]St. Rec. Vol. 2of 2, Motion Hearing Transcript, p. 8, 9/09/01.

[80]*Id.*, p. 9.

[81]St. Rec. Vol. 1 of 2, Trial Transcript, Lieutenant Vitter Testimony, p. 180, 3/12/02.

[82]St. Rec. Vol. 1 of 2, Trial Transcript, Lieutenant Vitter Testimony, p. 182, 3/12/02.

the right to an attorney, and he did not make any incoherent statements.  According to Vitter, during the drive from the scene to the jail, Corkern told him that he and his wife had been fighting and she was going to leave him so he shot her.[83]  Vitter testified that he was not interrogating Corkern at that time, he was just talking to him and Corkern never requested an attorney.  The testimony therefore supports the factual findings made by the state courts that Corkern voluntarily and knowingly made the recorded inculpatory statement without a showing that his constitutional rights were violated.

To overcome the presumption of correctness as to these findings, Corkern must rebut these factual findings by clear and convincing evidence, which he has not done.  In his federal habeas petition and related documents filed in this case, Corkern merely repeats his allegations that his possible intoxication was not considered by the state courts.  These allegations, however, are unsupported by any evidence adduced at the motion hearing, on appeal or otherwise.  The state courts' factual determinations regarding voluntariness are adequately supported by the record.  Therefore, this Court on habeas corpus review must accept as conclusive the state courts' factual determination that the challenged statement or confession was voluntary and was not a product of duress or misunderstanding.

Accordingly, the state courts' denial of relief on this issue is not contrary to, or an unreasonable application of, Supreme Court precedent.  Corkern is not entitled to relief on this claim.

## C.      Failure to Remove the Juror for Cause (Claim No. 3)

Corkern next alleges that the Trial Court erred when it failed to remove prospective juror Carolyn Garner for cause after she acknowledged that her husband was a captain for the Kentwood

---

[83]St. Rec. Vol. 1 of 2, Trial Transcript, Lieutenant Vitter Testimony, p. 183, 3/12/02.

Police Department.  Corkern contends that Garner's acknowledgment that she has never known her husband or his colleagues to make a wrong arrest indicates her bias towards law enforcement.

The State argues that Garner's relationship with law enforcement  alone is not enough to result in her disqualification.  The State also contends that during voir dire Garner indicated that she could remain fair despite the fact that her husband was a part of  law enforcement.

Corkern first raised this claim on post-conviction review before the Trial Court.  As outlined previously, none of the state courts articulated the reasons for the denial of relief on this, or any, of the post-conviction claims raised by Corkern.

The Sixth Amendment and Fourteenth Amendments provide a defendant with the right to a fair trial, which includes the right to an impartial jury.  *Morgan v. Illinois*, 504 U.S. 719, 727 (1992);  *Ross v. Oklahoma*, 487 U.S. 81 (1988); *Miniel v. Cockrell*, 339 F.3d 331, 338 (5th Cir. 2003).  In selecting such a jury, "[t]he standard for determining when a venire member may be excluded for cause is whether the prospective juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Soria v. Johnson*, 207 F.3d 232, 242 (5th Cir. 2000) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). "[R]efusal to grant a challenge for cause is within the discretion of the trial court, and it does not provide a basis for habeas corpus relief unless the disqualifying fact was so prejudicial that the refusal deprived the petitioner of a fundamentally fair trial."  *Sudds v. Maggio*, 696 F.2d 415, 416 (5th Cir. 1983).

Pursuant to La. Code Crim. P. art. 797, a juror may be challenged for cause if, among other things, the juror is "not impartial, whatever the cause of his partiality."  Implicit in a state court's denial of a challenge for cause is that the juror was not biased. *Jones  v. Butler*,  864  F.2d 348, 362

(5th Cir. 1988); *Miniel*, 339 F.3d at 338-39 (citing *Jones*); *Montoya v. Scott*, 65 F.3d 405, 419 n. 29 (5th Cir. 1995); *see also Fuller v. Johnson*, 114 F.3d 491, 500-01 (5th Cir. 1997).  This state court finding of non-bias is a factual one that is accorded the "presumption of correctness" under 28 U.S.C. § 2254(d).  *Jones*, 864 F.2d at 362; *Williams v. Cockrell*, 46 Fed. Appx. 227, 2002 WL 1940099, at *7 (5th Cir. Jul. 25, 2002).

Thus, the state trial court's "finding of impartiality is therefore 'presumed correct' unless it is 'not fairly supported' by the record viewed 'as a whole.'"  *Jones*, 864 F.2d at 362 (quoting 28 U.S.C. § 2254(d)(8)).  Additionally, the United States Supreme Court has made clear that "deference must be paid to the trial judge who sees and hears the juror."  *Wainwright*, 469 U.S. at 426.  As outlined above, Cockern has the burden of rebutting this presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Based on the Court's review, Corkern has not met this burden.

According to Corkern, the troublesome aspect of Carolyn Garner's voir dire responses is regarding the following question posed by the prosecutor:[84]

> Q.  Okay.  And the fact that your husband is a law enforcement officer, and has been for thirty-two years, does that in any way affect your ability to be fair and impartial to this man, and more importantly, require me to prove to you, beyond a reasonable doubt, which is my burden here, that he did commit the second degree murder of Elaine Corkern, can you do that in this case?
>
> A.  Yes.

Corkern points out that the question presented was a compound question such that it was not clear to which portion of the question Garner was answering "yes."  He queries whether she was answering yes to the first part of the question regarding whether her husband's role in law

---

[84]St. Rec. Vol. 1 of 2, Trial Transcript, Carolyn Garner, p. 40, 3/11/03.

enforcement would effect her ability to be fair or to the second part of the question where she would require the prosecution to prove the case beyond a reasonable doubt.[85]

During voir dire of prospective jurors, Carolyn Garner introduced herself and indicated that her husband was employed as a captain with the Kentwood Police Department.[86]   During questioning by the Court regarding relationships with law enforcement, Garner responded that her husband's work would not have any affect on her ability to be fair and impartial and that she would rely on the testimony.[87]  On questioning by the prosecutor, Garner indicated that she had not known her husband or his colleagues to have made a wrongful arrest.[88]  She also indicated that she would not automatically believe that an arrestee is guilty before he is given the chance to go to trial.[89]  She again acknowledged that in this case, she could be fair and impartial and require the State to prove his guilty beyond a reasonable doubt.[90]

Defense counsel urged a challenge for cause as to Garner based on her responses that she did not know her husband or his colleagues in law enforcement to make wrongful arrests and she would not fairly evaluate the evidence in the defense's favor.[91]  The prosecutor replied that she may have been confused by his questions; he argues that she was rehabilitated when she said that she would not assume that an arrest by any officer equated to guilt and that she could make a determination

---

[85]Rec. Doc. No. 4-1, p. 27.

[86]St. Rec. Vol. 1 of 2, Trial Transcript, Carolyn Garner, p. 17, 3/11/03.

[87]*Id*., pp. 25-26.

[88]*Id*., p. 39.

[89]*Id*., p. 40.

[90]*Id*.

[91]*Id*., pp. 86-87.

based on the evidence presented.[92]  After argument by counsel, the Trial Court denied the challenge for cause and found that she was rehabilitated and would be an acceptable juror.[93]  Defense counsel would later exercise a peremptory challenge to exclude Garner.[94]

The Trial Court was well-within its discretion in determining that Garner would not be biased towards the defense based on her husband's position in law enforcement.  Under Louisiana law, the mere relationship between a prospective juror and a law enforcement officer is not alone grounds to strike the juror for cause.  *State v. Kang*, 859 So.2d 649, 652 (La. 2003).  The same is true under federal law; a petitioner cannot establish bias merely by demonstrating that a relationship existed between seated jurors and members of law enforcement.  *Accord*, *Anthony v. Cain*, No. 2009 WL 3564827, at *15 (E.D. La. Oct. 29, 2009) (citing *United States v. Crooks*, 83 F.3d 103, 107 n. 16 (5th Cir. 1996) (marriage to law enforcement  official, without more, insufficient to constitute juror bias)).  Such a relationship was not enough to warrant dismissal for cause and is not enough to overcome the presumption of correctness on the part of the Trial Court.

Reviewing the transcript as a whole, there is nothing in the record, and Corkern points to nothing, that would indicate that Garner otherwise was biased.  She answered appropriately to the questions of being fair and impartial in rendering a verdict and in requiring the State to meet its burden beyond a reasonable doubt.[95]  The record therefore supports the Trial Court's factual finding of no bias.

---

[92]*Id.*, p. 87.

[93]*Id.*, p. 87.

[94]*Id.*, p. 89.

[95]*Id.*, pp. 25-26, 40.

Furthermore, Corkern's claim also fails for an additional reason. As noted above, Mrs. Garner was eventually rejected by counsel through the exercise of a peremptory challenge. The Supreme Court has "reject[ed] the notion that the loss of peremptory challenges constitutes a violation of the constitutional right to an impartial jury." *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988). Instead, after the denial of a challenge for cause, when the challenged juror was removed by use of a peremptory challenge, the petitioner is entitled to federal habeas corpus relief <u>only</u> if he demonstrates that the jury ultimately selected to try the case was not impartial. *Ross*, 487 U.S. at 85-86, 88-89; *Soria*, 207 F.3d at 232. Here, Corkern does not allege or establish that the jury ultimately selected to preside over his trial was anything other than impartial. His claim, therefore, fails to state a basis for federal habeas relief. *Dorsey v. Quarterman*, 494 F.3d 527, 533 (5th Cir. 2007); *Soria*, 207 F.3d at 232; *Lagrone v. Cockrell*, No. 02-10976, 2003 WL 22327519, at *12 (5th Cir. Sep. 2, 2003); *Stoves v. LeBlanc*, No. 2010 WL 3522957 (E.D. La. Sep. 1, 2010) (Vance, C.J.); *Higgins v. Cain*, No. 09-2632, 2010 WL 890998, at *27 (E.D. La. Mar. 8, 2010) (Order adopting Report and Recommendation); *Wilson v. Cain*, Civ. Action No. 06-890, 2009 WL 2163124, at * 12 (E.D. La. Jul. 16, 2009).

For the foregoing reasons, Corkern has not established that the Trial Court erred in denying the challenges for cause as to Garner. The state courts' denial of relief was not contrary to, or an unreasonable application of, Supreme Court law. Corkern has not established that he is entitled to relief on this claim.

### D.   Prejudicial Comments from Prospective Juror (Claim No. 4)

Corkern alleges that the Trial Court denied him a fair trial when the Court failed to respond after being notified that a potential juror made comments which could have tainted the jury. He

states that a potential juror with the last name of Vinyard, whom he claims was his former employer, said "I'm sorry, I just couldn't give Albert a fair trial knowing that he killed her."[96]  He claims that his sister and his daughter-in-law were sitting in the foyer by the snack machines during a court recess when they overheard Vinyard's comment.  He also contends that Vinyard had already been excused from the panel, and that her comment was made in front of other potential jurors.

Corkern indicates that his daughter-in-law, Annette Corkern, sent a letter to the Trial Judge informing him of what they heard.  He complains that the Trial Judge did not respond to the letter, did not notify defense counsel of the incident, or question the jurors about any potential prejudice.

The State contends that Corkern has failed to provide any evidence that any potential jurors actually heard any comments made by Vinyard.  The State points out that there is no record of any letter from Corkern's daughter-in-law regarding these allegations.  The State further notes that Vinyard had already been excused from the panel.  The State also argues that during the on-going voir dire of the other panel members, they would have been questioned about their ability to be fair and impartial.

Corkern raised this issue on post-conviction review, and relief was denied without stated reasons at every level of the state courts, including the Louisiana Supreme Court.

The Due Process Clause promises an accused the right to an impartial jury, one that determines guilt based on the evidence and the judge's instructions rather than preconceived notions or extraneous information.  *Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992); *Patton v. Yount*, 467 U.S. 1025, 1037 n.12 (1984).  "In addition-and this is critical-due process requires the trial judge, if he becomes aware of a possible source of bias, to 'determine the circumstances, the impact thereof

---

[96]Rec. Doc. No. 4-1, p. 29.

upon the juror, and whether or not it was prejudicial.'" *Oswald v. Bertrand*, 374 F.3d 475, 477-78 (7th Cir. 2004) (quoting *Remmer v. United States*, 347 U.S. 227, 230 (1954)).  A judge should normally undertake this assessment by questioning jurors directly, along with the participation and input of counsel.  *See Smith v. Phillips*, 455 U.S. 209, 217 (1982).  However, the adequacy of a judge's response "is a function of the probability of bias; the greater that probability, the more searching the inquiry" should be.  *Oswald*, 374 F.3d at 480.  Thus, to prevail on a due process claim that he was denied a fair trial due to juror prejudice, a petitioner must demonstrate "the actual existence of an opinion in the minds of the juror[s] as will raise the presumption of partiality." *Murphy v. Florida*, 421 U.S. 794, 800 (1975).  In many cases, improper communication or contact with jurors is deemed "presumptively prejudicial."  *Remmer*, 347 U.S. at 229.  This presumption, however, is not omnipresent, and no inquiry need be made by the Court where a "comment heard by a juror was ambiguous and innocuous."  *Whitehead v. Cowan*, 263 F.3d 708, 724-25 (7th Cir. 2001); *see also Sims v. Rowland*, 414 F.3d 1148, 1155 (9th Cir. 2005) ("*Remmer* and *Smith* do not stand for the proposition that any time evidence of juror bias comes to light, due process requires the trial court to question the jurors alleged to have bias.").

The Court first notes that, while Corkern references the letter from his daughter-in-law as an exhibit, he did not attach any such letter.  After a thorough review, neither the letter nor any reference to the letter exists as part of Corkern's record.  In other words, Corkern has failed to establish that the Trial Court was on notice of the alleged comment made by Vinyard such to trigger any action or concern by the Trial Court.

Furthermore, Corkern has failed to establish that the comment attributed to Vinyard was prejudicial.  As he quotes the statement, it is nothing more than Vinyard's expression that she did

not feel she could be fair and impartial.  This is likely the very reason she had already been excused

from the panel.[97]  The statement was innocuous and contains nothing that would presumptively

prejudice any other panelist who may have overheard the comment.  *Accord*, *Harmon v. Anderson*,

495 F. Supp. 341, 342 (E.D. Mich. 1980) (The fact that potential juror said she knew and did not like

the petitioner did not taint the whole panel, because  "[i]f such were the case, every time a juror

stated an opinion, favorable or unfavorable, about a party, and was later excused, it would be almost

impossible to obtain a jury, particularly in smaller communities.  Such is not the law.")

Furthermore, if any other panelist did over hear the comment, which Corkern has not

established, those persons continued through voir dire and their impartiality would have been tested.

Corkern does not suggest or establish that any person ultimately placed on his jury was in fact biased

or prejudiced as a result of Vinyard's remarks.

Corkern has not established any error by the Trial Court or violation of his right to a fair and

impartial jury or trial.  The state courts' denial of relief was not contrary to or an unreasonable

application of Supreme Court law.  Corkern is not entitled to relief on this claim.

### E.    Admission of Evidence of Prior Bad Acts (Claim No. 5)

Corkern argues that the Trial Court erred in allowing the State to introduce evidence of his

other harmful acts against his wife.  As an example, Corkern points to the prosecutor's questions to

his son, William Corkern, about his concerns for his mother's safety and the fact that he had stopped

his father from hurting her in the past.  Corkern alleges that he was not charged with any such acts

and that the State elicited the testimony without notice required by the Louisiana Code of Evidence.

---

[97]The Court notes that, after the first panel of 14 members for voir dire, the remainder of voir dire was not transcribed.  The court reporter indicated that no further objections were made to warrant transcription.  St. Rec. Vol. 1 of 2, Trial Transcript, p. 92, 3/11/03.

He also complains that the Trial Court did not give a limiting instruction to the jury with regard to this testimony.

The State contends that this claim is also meritless because Corkern's counsel did not object on the record during the trial to preserve the issue. The state contends that this issue therefore was not properly preserved for consideration by this Court. The State also argues that Corkern did not ask for a limiting instruction and therefore was not entitled to have one given.

Corkern raised this issue on post-conviction review, and relief was denied through the state courts without articulated reasons.

As an initial matter, the Court recognizes that the State here suggests that Corkern's claims are in procedural default because he did not enter a contemporaneous objection to the admission of the other crimes evidence. Procedural default does <u>not</u> bar federal court review of a federal claim raised in a habeas petition unless the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar. *Harris v. Reed*, 489 U.S. 255, 263 (1989); *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997). The decision of the state courts on post-conviction review were rendered without stated or articulated reasons. The record contains no indication that the state courts relied on a state procedural bar to deny relief on this claim. Without some showing that the denial of relief was based on a state procedural rule, this Court cannot address the State's suggestion that the claim is in procedural default. The Court will therefore consider the claim on the merits under the *Williams* standard of review.

Corkern here challenges the admissibility of the testimony from his son regarding the suggestion of Corkern's prior physical abuse of his wife. Habeas corpus review is, however, limited

31

to questions of constitutional dimension, and federal courts generally do not review the admissibility of evidence under state law. *Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992). States are free to implement procedures regarding the admission of evidence, provided that those procedures do not infringe on a constitutional guarantee. *Burgett v. State of Texas*, 389 U.S. 109 (1967). Therefore, federal courts do not sit to review the propriety of state court evidentiary rulings, unless the proceedings violate due process such that the violation renders the criminal proceeding fundamentally unfair. *Lisenba v. People of the St. of Ca.*, 314 U.S. 219, 236-37 (1941); *see United States v. Derden*, 978 F.2d 1453, 1458 (5th Cir. 1992) (errors of state law, including evidentiary errors, are <u>not</u> cognizable in habeas corpus, as such, and only rise to constitutional dimension if they so infuse the trial with unfairness as to deny due process such that they more likely than not caused a suspect verdict); *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991) (habeas review is proper only to determine whether a state trial judge's error is so extreme as to render the trial fundamentally unfair or violate an explicit constitutional right).

The question of due process in the criminal proceeding presents a mixed question of law and fact. *Dickson v. Sullivan*, 849 F.2d 403, 405-06 (9th Cir. 1988). Under the applicable standard of review, this court therefore must determine if the state court's decision is contrary to or involved an unreasonable application of Supreme Court precedent.

In *Lisenba*, the Supreme Court stated that the denial of due process "is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." *Lisenba*, 314 U.S. at 236. In keeping with this principle, the United States Fifth Circuit Court of Appeals has stated that the admission of

prejudicial evidence is fundamentally unfair so as to justify federal habeas corpus relief <u>only</u> if it is "material in the sense of a crucial, critical, highly significant factor." *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir. 1976) (quotation omitted); *Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir. 1983).

In this case, the testimonial evidence referenced by Corkern was admissible under Louisiana law. In *State v. Prieur*, 277 So.2d 126 (La. 1973), the Louisiana Supreme Court held that evidence of other acts of misconduct is <u>generally</u> not admissible to show the defendant's bad character, but that such evidence is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is part of the subject of the present proceeding. *See also* La. Code Evid. art. 404(B)(1); *State v. Jackson*, 625 So.2d 146, 148 (La. 1993). Under Louisiana law, to constitute impermissible other crimes evidence, the evidence must unambiguously implicate the defendant in another crime and not meet one of the aforementioned exceptions. *State v. Edwards*, 406 So.2d 1331, 1349 (La. 1981); *State v. Holmes*, 841 So.2d 80 (La. App. 4th Cir. 2003).

William Corkern testified that he was concerned for his mother's safety when he was unable to contact her on the Saturday after she was murdered. He also commented that she had been hurt in the past and he remained concerned for her well-being. A review of the transcript testimony reflects that William Corkern did not testify that his father had previously beaten his mother nor did he accuse his father of such acts. He simply noted his concerns for his mother's safety in light of the tumultuous relationship between his parents. This testimony was not wholly different from the statements made by Corkern himself to the police after the murder when he explained the argumentative nature of his relationship with Elaine. Corkern himself attested that Elaine had in the recent past left home and he did not know where she was or what happened to her during that time.

33

Nevertheless, Corkern has not established that the testimony given by William Corkern was inadmissible other crimes evidence or that the testimony was crucial to the verdict. The testimony was not given to establish Corkern's bad character, but was instead given to explain why William and other persons in the family persistently tried to locate his mother that fateful Saturday. Because Corkern has not demonstrated an error in the admission of William's testimony, he "has no basis for any alleged due process violation" or for a denial of a fundamentally fair trial. *See Robinson v. Whitley*, 2 F.3d 562, 567 (5th Cir. 1993); *see also Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998).

The state courts' denial of relief on this issue was not contrary to or an unreasonable application of Supreme Court law. Corkern is not entitled to relief on this claim.

### F.    Ineffective Assistance of Counsel (Claim Nos. 6, 7, 8)

Corkern claims that he is entitled to relief because his trial and appellate counsel gave ineffective assistance on a myriad of grounds as delineated previously in this report. He raised each of these grounds on post-conviction review and was denied relief through each of the state courts. The State contends that each of Corkern's grounds are without merit and should be denied.

The issue of ineffective assistance of counsel is a mixed question of law and fact. *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994). Thus, the question before this court is whether the state courts' denial of relief was contrary to, or an unreasonable application of, United States Supreme Court precedent.

The standard for judging the performance of counsel was established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. at 668, relied upon by the Trial Court. In *Strickland*, the Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and prejudice therefrom. *See*

34

*Strickland*, 466 U.S. at 697.  To meet the burden of proving ineffective assistance of counsel, the petitioner "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." *Jernigan*, 980 F.2d at 296; *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000), *cert. denied*, 531 U.S. 1167 (2001).

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment.  *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002).  "The defendant must show that counsel's representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 687-88; *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998).  The analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all of the circumstances.  *See Strickland*, 466 U.S. at 689.  "[I]t is necessary to 'judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690).  Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694; *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999).  Furthermore, "[t]o meet the prejudice prong, the [petitioner] must affirmatively prove, and not merely allege, prejudice."  *DeVille v. Whitley*, 21 F.3d 654, 659 (5th Cir. 1994); *Theriot v. Whitley*, 18 F.3d 311, 314-15 (5th Cir. 1994).  In this context, a reasonable probability of prejudice is "a

probability sufficient to undermine confidence in the outcome." *Id.*  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  *Crockett*, 796 F.2d at 793.  A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.'  But it is not enough, under Strickland, 'that the errors had some conceivable effect on the outcome of the proceeding.'"  *Motley*, 18 F.3d at 1226 (quoting *Strickland*, 466 U.S. at 693).  Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)), *cert. denied*, 531 U.S. 849 (2000).

In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.  *Kimler*, 167 F.3d at 893.  On habeas review, scrutiny of counsel's performance "must be highly deferential" and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance."  *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 689-90); *Mattheson*, 751 F.2d at 1441.

### 1.   Trial Counsel

#### a.   Refusal to Allow Him to Testify (Claim No. 6)

Corkern contends that his counsel failed to allow him to take the witness stand to testify on his own behalf.  According to Corkern, his counsel advised him the assistant district attorney "would tear you up if you take the stand because of your lack of education and I will not allow that to

36

happen."[98]  He also claims that counsel told him that he was in charge of the defense and that he would make the decision as to whether Corkern would testify.[99]

The State argues that there is no record of a disagreement between counsel and Corkern regarding the decision to testify.  The State points out further that Corkern did not make known his desire to testify to the Court or to anyone else to overcome the conclusion that Corkern accepted the advice of his counsel and chose not to testify.

It is well settled that a criminal defendant has the right to testify on his own behalf pursuant to the Fifth, Sixth, and Fourteenth Amendments.  *Rock v. Arkansas*, 483 U.S. 44 (1987); *Jordan v. Hargett*, 34 F.3d 310, 312 (5th Cir. 1994).  A defendant can only waive his right to testify if that waiver is knowing, intelligent and voluntary.  *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997).  A violation of this right occurs only if the "'final decision that [the defendant] would not testify was made against his will.'"  *Id*. (quoting *United States v. Teague*, 908 F.2d 752, 759 (11th Cir. 1990), *reh'g granted*, 953 F.2d 1525 (11th Cir. 1992), *cert. denied*, 506 U.S. 842 (1992)).

A habeas petitioner has the burden of proving that he was denied this constitutional right.  "[A] petitioner in a habeas proceeding cannot prevail on such a claim merely by stating to the habeas court that he told his trial attorney that he wished to testify and that his attorney forbade him from taking the witness stand."  *Turcios v. Dretke*, No. H-97-0515, 2005 WL 3263918 at *6 (S.D. Tex. 2005) (citing *Underwood v. Clark*, 939 F.2d 473, 475-76 (7th Cir. 1991)).[100]  Instead, the United

---

[98]Rec. Doc. No. 4-1, p. 35.

[99]*Id*.

[100]

The *Underwood* court specifically noted the potential problems that were bound to arise if habeas petitioners, making similar arguments, are not required to satisfy the required burden of proof.  *Underwood*, 939 F.2d at 475-76.  Adopting the reasoning in *Siciliano v. Vose*, 834 F.2d 29, 31 (1st Cir. 1987), the *Underwood* Court recognized that such an assertion, even if made under oath, "is insufficient to require a hearing or other action on his claim that his right to

States Fifth Circuit Court of Appeals has held that counsel's decision not to place a defendant on the stand is a strategy which seldom will support a challenge of ineffective assistance of counsel. *See Jones v. Cain*, 227 F.3d 228, 231 (5th Cir. 2000) (citing *Robison v. Johnson*, 151 F.3d 256 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999)).   Federal courts have consistently recognized that such tactical decisions when supported by the circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance.  *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999), *cert. denied*, 528 U.S. 1013 (1999) (citing *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997) and *Mann v. Scott*, 41 F.3d 968, 983-84 (5th Cir. 1994)).

The record here is devoid of any evidence that Corkern's trial counsel performed deficiently in advising and persuading Corkern not to testify.   In this case, it was clearly a reasonable trial strategy for counsel to advise his client not to testify about shooting his wife while she was walking through the house to collect her belongings so she could leave him.  Corkern's inculpatory statement had already been played for the jury.   The jury heard the testimony of his children and in-laws as to their efforts to find Elaine Corkern, and his efforts to impede their search.  The jury had evidence of the argumentative nature of the Corkerns' relationship, including Corkern's statement to police. Assuming Corkern's assertions to be true, counsel's strong recommendation against testifying represented a sound and reasonable trial strategy under the circumstances of the case.  *Accord Hollenbeck v. Estelle,* 672 F.2d 451, 454 (5th Cir. 1982) (holding that it was not unreasonable trial

---

testify in his own defense was denied him. It just is too facile a tactic to be allowed to succeed. Some greater particularity is necessary - and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify - to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim." *Id.*, 939 F.2d at 475-76.  The Court finds this analysis persuasive in addressing Corkern's claim here.

strategy for counsel to advise defendant not to testify as to self-defense where defendant "might do more harm than good by attempting to explain how six shots were fired in self-defense.").

For these reasons, the Court finds that counsel's advice not to testify was well within the bounds of reasonable professional assistance. The state courts' denial of relief on this issue was not contrary to or an unreasonable application of Supreme Court law. Corkern is not entitled to relief on this claim.

### b. Failure to Investigate, Call Witnesses, or Present a Defense (Claim No. 7(a))

Corkern also contends that his counsel provided ineffective assistance where he failed to investigate, call witnesses or present a defense to the charges, despite having been provided the names of four witnesses to investigate. Corkern indicates that he believed that his oldest son, his son's wife, his daughter-in-law's mother, and his own sister would have testified that he and the victim, although married for eighteen years, were having marital problems which they were trying to work through. According to Corkern, this testimony would have provided a different insight into his mind and the relationship between he and his wife. He claims that this also would have countered the testimony of his youngest son William and his wife, who had a strained relationship with him.

In contrast, the State contends that the record does not support his contention that his attorney failed to conduct any investigation. The State points out that Corkern's attorney filed pretrial discovery motions and a motion to suppress statement. The State also contends further that the four witnesses identified by Corkern would have provided testimony about facts already before the jury.

It can hardly be said that Corkern's counsel did no pretrial investigation to prepare for trial. This record is replete with pretrial motions, including motions for discovery, for bill of particulars, for preliminary examination, and to suppress, seeking disclosure of information only an informed attorney would seek and/or challenging the evidence and statements sought to be used by the prosecution. The detailed questioning of the witnesses at the suppression hearing and at trial reflects that counsel was well-prepared and well-informed. Nevertheless, even if more could have been done to prepare, under *Strickland* and its progeny, to establish ineffective assistance Corkern would have to demonstrate that, but for counsel's failure to investigate, there is a "reasonable probability" that a jury would not have found him guilty. *Accord Strickland*, 466 U.S. at 694. This reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Vasques v. Thaler,* No. 08-70034, 2010 WL 3168206, at *5 (5th Cir. Aug. 11, 2010) (citing *Strickland*, 466 U.S. at 694).

Corkern does not expound on what more his counsel could have found with further investigation, nor has he shown how it would have impacted the jury's decision. Corkern has not established that counsel failed to investigate or that his investigation fell short of constitutional performance.

Furthermore, it is well settled that "'[c]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.'" *Graves v. Cockrell*, 351 F.3d 143, 156 (5th Cir. 2003) (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)). In order to demonstrate prejudice arising from failure to call witnesses, the petitioner must show that the witness would have testified at trial and that the testimony would have been favorable. *Alexander*

40

*v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).  There must be a "'reasonable probability' that the uncalled witnesses would have made [a] difference to the result."  *Id.*, at 603 (citation omitted).

Corkern has not demonstrated here that the four witnesses he names were willing and available to testify at trial, nor has he provided more than conjecture as to what they would testify. *See Bray v. Quarterman*, 265 Fed. Appx. 296, 298-99 (5th Cir. Feb. 11, 2008).  Further, as argued by the State, the record demonstrates that evidence of the marital strife at the Corkern home was already before the jury.  In such a case, the testimony sought to be offered by the four uncalled witnesses would have been redundant and unnecessary.  *See Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984) (counsel's decision not to present cumulative testimony did not constitute ineffective assistance).  Corkern also has not shown that the subject testimony would have aided his defense as required to establish ineffective assistance.

With regard to counsel's alleged failure to raise a defense, Corkern also has failed to provide this Court with the specifics of his claim.  He has not pointed to any particular defense that should have been raised by counsel.  Furthermore, a review of the record reflects that counsel posed questions tending to vitiate the State's showing of intent, perhaps to persuade the jury regarding a manslaughter verdict.  Counsel questioned the State's witnesses regarding Albert Corkern's and Elaine Corkern's alcohol use, including at the time surrounding the shooting.[101]  Counsel also questioned the State's witnesses about Corkern's state of mind and manner.[102]  There is no doubt from the record that counsel in fact pursued a defense to the allegations brought by the State.  The

---

[101]St. Rec. Vol. 1 of 2, Trial Transcript, Jennifer Corkern Testimony, pp. 140-42, 3/12/03; Trial Transcript, William Corkern Testimony, pp. 161-62, 168, 3/12/03; Trial Transcript, Lieutenant Vitter Testimony, pp. 188-89, 3/12/03;  Trial Transcript, Detective Varnado Testimony, pp. 239-40, 3/12/03; Trial Transcript, Dr. Mackenzie Testimony, pp. 287-88, 3/13/03.

[102]St. Rec. Vol. 1of 2,  Trial Transcript, Lieutenant Vitter Testimony, pp. 183, 3/12/03; Trial Transcript, Detective Varnado Testimony, pp. 238-39, 241-42, 3/12/03.

fact that a defense was not successful does not stand alone to establish deficient performance. *Martinez v. Dretke*, 99 Fed. Appx. 538, 543 (5th Cir. 2004).   "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland,* 466 U.S. at 689 (citations omitted).

For the foregoing reasons, Corkern has failed to establish that his counsel's performance was deficient or prejudicial.   The state courts' denial of relief on this issue was not contrary to or an unreasonable application of Supreme Court law.   Corkern is not entitled to relief on this claim.

### c.        Failure to Object to Admission of Prior Bad Acts (Claim No. 7(b))

Corkern also contends that his counsel failed to object to the testimony from William Corkern regarding the alleged prior bad acts, that is William's reference to his concerns for his mother's safety and to her being hurt previously by his father.   He contends that his counsel should have objected to the testimony and to the prosecution's presentation of this testimony.   The State argues in opposition that Corkern failed to show that his counsel's performance was actually deficient and in fact had a prejudicial effect on the verdict since the testimony was not inadmissible.

For the reasons set forth previously in this report, the Court has resolved that the testimony given by William Corkern was not inadmissible under state law and did not violate Corkern's due process rights under federal law.   It follows, therefore, that counsel's failure to object to the testimony was neither deficient nor prejudicial under *Strickland*.   Counsel's failure to make a frivolous or baseless objection is not deficient performance below an objective level of reasonableness.   *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998).

The state courts' denial of relief on this issue was not contrary to or an unreasonable application of Supreme Court law.   Corkern is not entitled to relief on this claim.

d.    **Stipulated to Testimony of Forensic Scientist (Claim No. 7(c))**

Corkern also complains that his counsel stipulated to the testimony of the forensic scientist, which is an admission to the jury that the testimony would have been correct. Corkern contends that his counsel should have required the prosecution to call the witness to allow for cross-examination to bring to light contradicting other facts in the expert report.

The State contends that this claim also lacks merit and notes that Corkern admitted to the police that he shot his wife while at home with a rifle he kept behind his chair. The State points out that the forensic scientist would have testified that the shell casing that was taken from the house was fired from the rifle that Corkern admitted he used and kept behind his chair. Finally, the State contends that the simple possibility that additional facts could have "come out" does not meet the test in *Strickland*.

At trial, the State sought to call Patrick Lane, as an expert in forensics, who prepared a report showing that the shell casing which was recovered from Corkern's home was positively fired from Corkern's rifle, which was already in evidence at this point.[103] Corkern's counsel agreed to stipulate, based on the report, that Mr. Lane was a forensic expert and that his report indicates that the casing tested was fired from Corkern's gun.[104]

The record demonstrates that Corkern had already admitted that he shot his wife with the .22 caliber rifle in question. The stipulation by counsel was no more than acceptance that the report confirmed that the casing found at the home was fired from that rifle. There is nothing in the record

---

[103]St. Rec. Vol. 1 of 2, Trial Transcript, p. 248-49, 3/12/03.

[104]*Id.*, pp. 249-51.

to demonstrate that counsel's decision to stipulate to Lane's testimony as a forensics expert was within counsel's sound trial strategy.

The state courts' denial of relief on this issue was not contrary to or an unreasonable application of Supreme Court law.  Corkern is not entitled to relief on this claim.

### e.        Failure to Request a Sanity Commission (Claim No. 7(d))

Corkern also contends that his counsel was ineffective because they should have requested a sanity commission to assess his capacity to understand the proceedings and the charges.  He alleges that he told his counsel that he did not remember shooting his wife, and that counsel should have requested a sanity commission based on that and his illiteracy.  He contends that a sanity commission would have been able to determine whether he had the "specific intent" to kill his wife.

The State argues in its opposition memorandum that the record demonstrates that Corkern was able to speak to and assist his counsel.  The State further contends that the record does not support the suggestion that Corkern should have been examined by a sanity commission.  Further, the state points out that a sanity commission's purpose is to determine only if a defendant is competent to stand trial, and not to decide whether specific intent existed.

Corkern's alleged lack of education and diminished memory provided no defense to his guilt under Louisiana law.  *See State v. Pitre*, 901 So.2d 428, 444 (La. App. 1st Cir. 2004).  "A mental disease or defect short of insanity cannot serve to negate an element of the crime.  For that reason, such evidence is not relevant to the issue of a defendant's guilt or innocence.  Moreover, evidence of a mental disease or defect affecting defendant at the time of an offense is inadmissible, whether it is an organically caused mental condition or a psychologically or emotionally induced mental condition." (citations and footnote omitted) *Id*., at 444.  Thus, Louisiana law would not allow

counsel to raise a defense to guilt based on Corkern's alleged illiteracy.  Counsel would not have been deficient in his performance for failing to address or pursue a meritless defense.  *Green v. Johnson*, 160 F.3d at 1037.

Instead, the effects of a defendant's mental state is governed by La. Rev. Stat. § 14:14 and if proven, acts as an exemption:

> If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility.

It is a violation of due process to try and convict a defendant who lacks mental competence. *Cooper v. Oklahoma*, 517 U.S. 348 (1996); *Pate v. Robinson*, 383 U.S. 375 (1966); *Carter v. Johnson*, 131 F.3d 452 (5th Cir. 1997).  The constitutional standard for competency is whether a defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960).  A defendant is denied a fair trial where the evidence and circumstances should raise a reasonable doubt about his competence and the court, or in this case his counsel, fails to make further inquiry. *See Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1980).

In this case, Corkern does not allege that he was incompetent to stand trial in the manner set forth in La. Rev. Stat. Ann. § 14:14. *See Drope v. Missouri*, 420 U.S. 162, 172 (1975).  He makes no argument and provides no proof that he did not understand the proceedings against him.  Corkern, instead, seeks to defend his actions against this victim by pointing to unsupported allegations of prior learning disabilities.  This was not a sufficient basis for his counsel to have pursued a sanity commission.

The Court notes that there is nothing in the record that suggests that Corkern's counsel or the Trial Court had a reasonable factual basis for requesting an examination by a sanity commission. Corkern does not deny that he was able to assist his counsel and, even here, indicates that he provided counsel with the names of potential witnesses to pursue.  There is nothing in the record to indicate that his demeanor before counsel or the Court was ever questionable.  Corkern has not alleged a history of the type of mental instability or medical diagnosis which would cause counsel to question his competency.  The record reflects that Corkern has filed a host of motions, participated in all aspects of the case, and even suggested that his counsel call witnesses to support his position.  Counsel's decision not to file a frivolous request for examination by a sanity commission, was neither deficient nor prejudicial under *Strickland*.

The state courts' denial of relief on this issue was not contrary to or an unreasonable application of Supreme Court law.  Corkern is not entitled to relief on this claim.

### f.      Failure to Raise Defense of Intoxication (Claim No. 7(e))

Corkern contends that his counsel provided ineffective assistance because he failed to raise the defense of intoxication.  Corkern contends that he "was a known alcoholic" and the police had been to his house many times for disturbances because of his alcohol abuse.  He contends that, because he did not remember what really happened and his blood alcohol level was .169 at the time of his arrest, his intoxication could have led the jury to conclude that he did not possess the specific intent to commit the murder.

The State contends that counsel's choice not to utilize a defense of intoxication does not violated the *Strickland* requirements.  The State further points out that Corkern admitted in his statement that he picked up the rifle and shot his wife, which was evidence to establish specific

intent.  The state points out that there is no evidence to suggest that had his counsel used this trial tactic that he would have not have been convicted of second degree murder.

In considering this issue, the Court notes, as outlined above, that the record reflects that counsel did ask the State's witnesses about Corkern's intoxication and/or his history of alcohol abuse.  There was not testimonial evidence presented either by the fact or law enforcement witnesses that he was or appeared to be intoxicated at the time of his arrest.  Contrary to Corkern's suggestion, his counsel attempted to reasonably develop evidence that he had consumed alcohol which would have contributed to his decreased mental state at the time he killed his wife.[105]

Further, the Court notes that .169 was the level of alcohol in the victim's body at the time of the autopsy.[106]  There is no evidence that a blood alcohol test was done to Corkern to substantiate his suggestion that he was intoxicated when he was arrested.  Furthermore, the fact that by his own admission the murder occurred the night before, his intoxication level, if any, at the time of his arrest would not have been relevant to his state of mind at the time of the murder.

The Court finds that his counsel's use of witness interrogation was a reasonable strategic attempt to develop evidence to support the defense of intoxication.  The state courts' denial of relief on this issue was not contrary to or an unreasonable application of Supreme Court law.  Corkern is not entitled to relief on this claim.

---

[105]St. Rec. Vol. 1 of 2, Trial Transcript, Jennifer Corkern Testimony, p. 140, l.22-31, p. 142, l.13-19, l. 26-27, 3/12/03; Trial Transcript, William Corkern Testimony, p. 152, l.24-31, p. 153, l.27-31, 3/12/03; Trial Transcript, Lieutenant Vitter Testimony, p.182, l.2-12, p.188, l.16-28, 3/12/03; Trial Transcript, Lieutenant Varnado Testimony, p. 239, l.23-31, p.240, l.20-31, 3/13/03.

[106]St. Rec. Vol. 1 of 2, Trial Transcript, Dr. Mackenzie Testimony, p. 288, 3/12/03.

### 2.    <u>Appellate Counsel</u>

Corkern contends that while he had appointed appellate counsel to file his direct appeal, she failed to raise the issue regarding the biased juror who was overheard by his daughter-in-law making an allegedly prejudicial remark in the presence of other prospective jurors.  Corkern contends that the failure of his appellate counsel to investigate and raise this claim renders her representation ineffective.

The State argues that this claim must fail, because the there was no objection made during the trial to preserve the issue for further review.  Therefore there was nothing for appellate counsel to raise.

Louisiana law, specifically La. Code Crim. P. art. 841, provides that "[a]n irregularity or error cannot be availed of after a verdict unless it was objected to at the time of occurrence." Without a claim being properly preserved in this manner, Corkern's appellate counsel was not in a position to raise the claim on appeal.  Appellate counsel was not ineffective for failing to raise what would be a meritless issue on appeal.  *See Penson v. Ohio*, 488 U.S. 75, 83-84 (1988) (noting that courts have refused to find counsel ineffective when the proposed appellate issues are meritless); *Medellin v. Dretke*, 371 F.3d 270, 279 (5th Cir. 2004) (where overall claim without merit, ineffective assistance of counsel claim based on failure to raise issue likewise without merit); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) (failure to raise meritless objection not ineffective  assistance of counsel); *Williams v. Collins*, 16 F.3d 626, 634-35 (5th Cir.1994) (where issue is without merit, failure to raise the issue on appeal cannot satisfy prejudice prong of *Strickland*).

Furthermore, as discussed thoroughly above, Corkern has failed to demonstrate a state law error or federal constitutional violation arising from the Trial Court's failure to address the alleged

comment made by the prospective juror Vinyard.  He failed to prove that the Trial Court was on notice of such a comment to have triggered the Court's concern.  He also has not established that the comment was of a prejudicial nature to have potentially tainted the other potential jurors; nor has he proven that the other jurors were in fact tainted or that they became biased jurors sitting over his trial.  Thus, without some viable claim to have presented, Corkern's appellate counsel was not ineffective under the *Strickland* standards.

The state courts' denial of relief on this issue was not contrary to or an unreasonable application of Supreme Court law.  Corkern is not entitled to relief on this claim.

## VI.   **Recommendation**

It is therefore **RECOMMENDED** that Albert Corkern's petition for issuance of a writ of habeas corpus be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings  and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[107]

New Orleans, Louisiana, this 23rd day of December, 2010.

KAREN WELLS ROBY
UNITED STATES MAGISTRATE JUDGE

---

[107]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

49